Duval Lance **PHELPS, Jr.,** Appellant,

v.

The **STATE** of Texas, Appellee.

No. 04–97–00084–CR.

Court of Appeals of Texas, San Antonio.

Sept. 22, 1999.

Rehearing Overruled Oct. 20, 1999.

Joe Mike Egan, Jr., Kerrville, for Appellant.

Ronald L. Sutton, Dist. Atty., Donnie J. Coleman, Asst. Dist. Atty., Junction, for Appellee.

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, FRANK MALONEY,[1] Justice.

## OPINION

Opinion by: FRANK MALONEY, Justice (Retired).

The appellant was charged by indictment in separate counts. One count charged that on March 20, 1996, appellant committed aggravated sexual assault by causing the penetration of the anus or female sexual organ of another person by any means without that person's consent and another count charged that on March

1. Texas Court of Criminal Appeals, Judge (Ret.) on assignment by the Chief Justice of the Supreme Court.

20, 1996, appellant committed aggravated sexual assault by causing the sexual organ of appellant to contact or penetrate the sexual organ of another person, without the consent of that person. *See* TEX. PEN. CODE ANN. §§ 22.021(a)(1)(A)(i), 22.021(a)(1)(A)(iii) (Vernon 1994). The named victim in both counts was C.W., a thirteen-year old child. Appellant pled not guilty before a jury on each count and was found guilty by the jury on both counts. His sentence was assessed by the jury at confinement in the Institutional Division of the Texas Department of Criminal Justice for 25 years on each count to be served concurrently. The case was originally tried in Kerr County, Texas, but the jury was unable to reach a decision and the Court declared a mistrial. The Court, on its own motion, changed venue to an adjoining county, Gillespie County, and the case proceeded to trial resulting in the aforesaid convictions.

## FACTS

Although the appellant does not raise the issue of legal or factual sufficiency, a brief statement of the evidence is necessary in order to decide appellant's points.

## THE STATE'S EVIDENCE ON GUILT/INNOCENCE

Debbi Thomas testified that she married appellant. Thomas lived with her two daughters of a prior marriage and appellant. One of the daughters, C.W., is the named victim in both counts of the indictment. The marriage began to deteriorate after the first year. Things got so bad that one of the children checked herself into a children's shelter. Debbi told appellant that she intended to seek a divorce. On the evening of the alleged offenses, after Debbi got into her bed, appellant threw himself across her and pinned her to the bed. According to her testimony, appellant handcuffed her to the headboard and tied her to the bed with neckties and the sash of her robe. Subsequently, he exhibited a handgun and told her that if

she did not convince him she was not going to leave him that he had a "tool" that he could use to make her stay. He then blindfolded her and left the bedroom. He returned with the victim, C.W., and told C.W. to lie down on the bed.

C.W. testified that appellant told her to go into the bathroom with him, take off her clothes, then go into his and her mom's room and to lie down and be quiet, which she did. He then tied her hands to the bars of the headboard. She started to cry and wondered why he was doing what he was doing and what was going to happen to her and her mother.

C.W. further testified that appellant began talking about the past, his ex-wife, and what he had done in the war. The things he said made no sense to her. Several times throughout the evening, appellant had the gun out; sometimes he was standing, sometimes walking, and sometimes sitting. C.W. testified that she was in the room with appellant and her mother for approximately three and one-half hours. She was not tied to the bed all of this time, but her mother was tied up during the entire time and blindfolded most of the time. She testified that while she was lying with her hands tied behind her head, appellant fondled her breasts and penetrated her vagina with his finger. She also testified that seeing the gun scared her and she did not believe that either she or her mother would live until the next day. Appellant made her use a dildo on her mother and while doing that, appellant stuck his penis in C.W.'s vagina from behind her. She said that about 2:30 a.m. appellant sent her to her own bedroom, where she went to sleep. She was awakened later by appellant yelling, "Wake up, [C.W.]. Your mother shot me."

Debbi testified that after appellant sent C.W. from the room, he suddenly said, "You've won," untied her, and told her to get up and put her housecoat on. Appellant left the room to go to the bathroom. When he came back and laid down on his back like he was going to sleep, Debbi

grabbed the gun which appellant had put at the end of the bed. She then shot him in the shoulder and fled the house.

During C.W.'s testimony on the State's main case, the State elicited that appellant had sexually assaulted her five times before March 19, 1996.

## THE DEFENDANT'S EVIDENCE ON GUILT/INNOCENCE

Appellant testified and denied any sexual contact with C.W. at any time. He also denied that Debbi was bound or assaulted on the day in question. He stated that he had not been involved in violent activities while in the military, that Debbi was more or less the boss of the household and that he did not go against her. He stated that two days before the alleged events occurred, he told Debbi that if she wanted a divorce he would let her have one, but she stated she did not want a divorce. However, on the 19th of March, she said that she did want a divorce and that he told her that if that's what she wanted that he couldn't stop her. He said that he did not get upset. However, he kept trying to find out why she wanted a divorce, but she never did respond to him, and he could not get a straight answer from her.

He testified that on the day alleged in the indictment, it was Debbi who asked if they could make love one more time and that he agreed to do so. The sex play was Debbi's idea; she liked to be tied up and that they did it a couple of times a week. He admitted tying her up that date and blindfolding her. According to appellant, C.W. stuck her head into the bedroom twice that evening, but did not in any way participate or enter the room during that evening at all.

Dr. Norma Conroy, a psychiatrist appointed by the trial court as an expert witness for the defense, testified that after comparing the testimony of Debbi and the videotape of C.W., it was her opinion that the repetitious theme indicated that Debbi was, in fact, the source of both her testimony and the child's testimony. She testified that Debbi was a controlling person and that C.W. was used to receiving her instructions from her mother and responding to her mother as an authority figure. Dr. Conroy described the appellant as "C–L–U–E–L–E–S–S", wanting to please everybody, to make everything nice; that he is not mean, not violent, nor in any way aggressive. In her opinion, the bedroom scenario evidenced that appellant was only trying to please his wife; he had asked her what she wanted to do. His wife gave the orders and he was trying to make her happy.

On cross examination by the State of Dr. Conroy, the following exchange took place:

Question ... (Are you stating) that this man is a passive person or not a passive person?

Answer Yes, he's passive....

Question ... Now, you also testified that this defendant was not mean, not violent, not aggressive, and floats through life?

Answer Yes—yes, ma'am.

Question ... You would agree, would you not, Dr. Conroy, that sexual violence is the ultimate way to exert power and control over a female?

Answer Oh, other than murder.

Question But that would be the ultimate way to humiliate her, to teach her a lesson, to make her fearful?

Answer Yes.

. . . .

Question Okay. And you are also aware through your training and experience that violence and threats against children are often used to control women or to constrain them, aren't you?

Answer Yes, ma'am.

On re-direct, Dr. Conroy testified that she saw the appellant as the victim of this dysfunctional family that he married into and that from February 17 until March 20 the situation was accelerated in that period of time.

## STATE'S REBUTTAL EVIDENCE ON GUILT/INNOCENCE

The State, on rebuttal over objection, called Lori Harrell, one of appellant's ex-wives, who testified that she did not have enough fingers to show the number of times in just the year 1994 that she had seen the defendant drunk. Furthermore, she testified that he had told her, and she believed, that he was a paid assassin for the United States government; if anyone said that he is not mean, he is not violent and he is not aggressive, they did not know him like she did; he was aggressive with her and in 1994 on several occasions he forced her to do sexual acts with him that she did not want to do. She further testified that on July 4, 1994, she and appellant and her two children, ages 5 and 7, had gone to the park to spend the day and see the fireworks display. On the way home, she and appellant got into an argument. When they got to the apartment, she wanted to leave, but appellant said she could not go anywhere. She tried to phone for help, but he pulled the telephone cord out of the wall. He got a 12–pack of beer that he had bought on the way home and a .22 semi-automatic pistol and sat on the floor in front of the only door. He said he was going to kill her, her kids and himself. She put the children in another bedroom and locked the door. She went into her bedroom, shut the door and locked it, jumped out of the window, and ran to the landlord's apartment and called the police. When she returned to the apartment, she found that appellant had taken her children into the living room. She took the kids back to the bedroom, broke the screen out, put them out the window and told them to run away. The police arrived shortly thereafter.

She testified about another instance where the appellant had grabbed her by the throat, choked her, picked her up and threw her against the refrigerator. She finally escaped, got into her automobile, but the appellant followed her and broke the window out of the car door, at which time he pulled her out of the car, threw her on the hood and started choking her. Appellant banged her head on the hood and told her he was going to kill her. She told the jury about a third occasion when appellant was drinking, which concerned his grabbing her by the throat and throwing her around the house and threatening he would kill her. Thinking she was going to die anyway, she began to fight back, and then suddenly, he just quit. She left the house and went to the police.

Appellant brings forth three points on this appeal.

POINT I:

The trial court committed reversible error by permitting defendant's ex-wife, Lori Harrell, to describe defendant as a bad person, which description included twelve extraneous offenses imputed to the defendant.

POINT II:

The trial court committed reversible error by permitting the complainant, C.W., to testify that defendant had sexually assaulted her on five separate occasions prior to the two for which he was being tried.

POINT III:

Appellant was denied his fundamental right to a fair trial guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution and Section 19 of Article I of the Texas Constitution by admission of evidence of numerous extraneous bad acts, including nineteen which constituted criminal offenses, during the innocence or guilt phase of the trial.

### *POINT I*

The trial court committed reversible error by permitting defendant's ex-wife, Lori Harrell, to, in effect, describe defendant as a bad person, generally, which description included twelve extra-

neous offenses imputed to the defendant.

In September of 1996, the State filed its "notice of extraneous offense" alleging:

The State also intends to offer as impeachment or substantive rebuttal at guilt/innocence or as substantive evidence at punishment (or as both) the following acts, occurring in Kerr County, Texas, information on all of which has previously been furnished to defendant;

. . .

The assaults on Floria Lorraine Harrell, by defendant occurring in Kerr County, Texas on or about July 4, 1994 (threats with gun to her and her children); September 21, 1994 (threats with knife to throat, physical injury to her, blows and choking); and October 17, 1994 (physical injury to her, blows and choking).

The trial court conducted two hearings out of the presence of the jury after Dr. Conroy's direct examination. The question during the first hearing was whether or not Conroy's direct examination had opened the door to the use of extraneous offenses. In the first hearing, the Court ruled, ". . . the door is open, it's wide open . . ."

In the second hearing at the conclusion of Ms. Harrell's testimony, outside the presence of the jury, the trial court stated:

It's because of your expert witness that we're in the position that we're in right now, because of the Defense's expert witness that has absolutely portrayed the defendant as an absolute docile, non-aggressive, peaceful person who only does what his wife tells him.

Defendant's objections to Harrell's testimony, made at that time asserted that the testimony of Lori Harrell would:

(1) violate Rule 404(b) because other crimes, wrongs or acts are not admissible to prove the character of a person in order to show that he acted in conformity therewith on the occasion in question;

(2) only relevance would be to show that the defendant is a bad person, generally (Lori's testimony would not impute sexual assaults on children— the offenses for which defendant was on trial);

(3) constitute bootstrapping because admitting extraneous offenses to add credibility to another extraneous offense, the alleged sexual assault on Debbi Thomas, the only instance of physical violence imputed to defendant in the record to this point;

(4) be violative of due process of law because denying his fundamental right to be tried for what he is charged with and not for being a bad person, generally;

(5) be violative of Rule 403 because its probative value is substantially outweighed by the unfair prejudice which would result;

(6) be unnecessary to the State's case which, rather than depending on circumstantial evidence, is supported by eyewitness testimony of two witnesses who corroborate each other;

(7) distract the jury's attention away from the only two charged offenses in a record already cluttered with seven other extraneous felony offenses;

(8) inflame the jury against the defendant to such a degree as to make the jury feel duty to get such a dangerous person as the defendant off the street, whether or not convinced beyond a reasonable doubt that he committed either of the two offenses for which he was being tried; and

(9) force the defendant to defend himself against evidence of other crimes and bad acts of which he had no notice;

The Court ruled that Lori Harrell's testimony of the defendant's prior extraneous bad acts and crimes could be presented to the jury. The Court found that the defendant's expert witness had portrayed the

defendant as a non-aggressive, peaceful person who only did what his wife told him.

The trial court also concluded:

... In doing the balancing test, which we are required to do, and having had a hearing and still being in the hearing outside of the jury, I think that—that the door has been opened ... I think the probative value certainly outweighs the prejudicial value in that there is definitely a material issue being contested as to the peaceability or the peaceful nature of this defendant. And I think that the jury is at this point not in a position to do a fair evaluation by the picture that's been painted by the Defense's expert.... The testimony that was elicited and stated by the Defense's expert includes the fact that—that his—the defendant's personality is just one that would not do these things. And she is the psychiatrist, and she's been presented as the expert, and I think that with that—with that thought, I'm going to allow the State to go into those items of which she had previously given notice.

### APPELLANT'S ARGUMENT

The appellant on appeal argues that whether defendant inflicted physical violence, actual or threatened, upon his wife, Debbi, was a non-issue in the trial, at least in the sense that neither of the two charged instances of sexual intercourse with the thirteen-year-old child was other than consensual.

The appellant further maintains that there is nothing in the record that shows any physical violence was actually inflicted upon the child (C.W.) by him, nor is there any evidence of threats made by appellant to inflict physical harm upon C.W., nor is there any evidence of resistance by C.W.

Appellant further states that the issue is not whether the appellant was of a "peaceful" or "violent" nature, rather it was whether or not he was inclined towards having sex with children. In addition, at the time the testimony of Lori Harrell was admitted, the State had already over objection of appellant, imputed five extraneous aggravated sexual assaults of C.W. to the appellant. The appellant argues that the admission of Lori Harrell's testimony had nothing to do with whether or not appellant had committed aggravated sexual assault on C.W., that the addition of the testimony by Lori Harrell to the previously admitted evidence of aggravated sexual assaults already before the jury, established the conclusion, that he was such a bad person, he must have committed the two charged offenses and thus created undue prejudice in violation of Rules of Evidence 404(b) and 403. He argues that the probative value of Lori Harrell's testimony concerning the alleged bad acts committed by the appellant was substantially outweighed by the danger of unfair prejudice.

### STATE'S ARGUMENT

The State asserts that written notice of the State's intent to use extraneous offense evidence concerning Lori Harrell had been provided to appellant prior to trial. Rule 404 of the Texas Rules of Evidence has always allowed uncharged misconduct to directly or indirectly rebut a defense.

The State maintains that the evidence presented by the defense, and also by cross-examination of the State's witnesses, was that (1) Debbi Thomas had shot appellant for his insurance benefits once he had designated her as his beneficiary and that the victim, C.W., and her mother had made up a "confabulated" story about the events which took place on the date alleged in the indictment; (2) that appellant was a "clueless" victim who wanted nothing more than to please his wife; and, (3) that he was a passive person not capable of having committed the acts charged against him.

The acts testified to by Lori Harrell were offered by the State to refute the testimony that appellant was a passive person controlled by Debbi Thomas; and that appellant did not and could not use violence against the mother or her child;

that he was not mean, not violent, and not in any way aggressive. The Harrell evidence also lended credit to Debbi Thomas' testimony. It was not the first time that the appellant had used children as a "tool."

In reference to whether or not aggravated sexual assault of a child is a crime of violence, the State cites *Wisdom v. State*, 708 S.W.2d 840 (Tex.Crim.App.1986), setting out the reclassification by the legislature of rape, aggravated rape, sexual abuse, aggravated sexual abuse, rape of a child, sexual abuse of a child into two new laws entitled "Sexual Assault and Aggravated Sexual Assault." *See generally* Tex. Pen.Code Ann. §§ 22.011, 22.021 (Vernon 1994). These offenses were declassified as sexual offenses and reclassified as assault offenses. The court in *Wisdom*, stated: "[a] penetration of the victim occurs in all rapes [citation omitted]. This act of penetration is a violent act, no matter what the circumstances are which prove that the victim did not consent. This conclusion is reflected in the nature of rapes." *Id.* at 844.

The State also maintains that the evidence offered by appellant and his expert witness painting appellant as a non-violent person opened the door to Lori Harrell's testimony.

### OPINION

■ Since appellant, at the time of the admission of the testimony of Lori Harrell, objected both under Tex.R. Evid. 403 and 404(b), the issues of admissibility and prejudice are properly before us.

■ Although Rule 403 favors the admission of relevant evidence and carries the presumption that relevant evidence will be more probative than prejudicial, *see Jones v. State*, 944 S.W.2d 642 (Tex.Crim. App.1996); *McFarland v. State*, 845 S.W.2d 824 (Tex.Crim.App.1992), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. As stated in the recent case of *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex.Crim.App.1999):

A trial judge has broad discretion in admitting or excluding evidence. A trial judge, however, may exercise her discretion in excluding evidence only when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, by considerations of undue delay, or needless presentation of cumulative evidence. Tex.R.Crim. Evid. 403; *see also Gilbert v. State*, 808 S.W.2d 467, 471–72 (Tex.Crim.App.1991); *Crank v. State*, 761 S.W.2d 328, 342 n. 5 (Tex. Crim.App.1988). In reviewing the trial court's balancing test determination, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Montgomery*, 810 S.W.2d at 389. The trial court's ruling must be measured against the relevant criteria by which a Rule 403 decision is made .... [t]he reviewing court must look at the proponent's need for the evidence in addition to determining the relevance of the evidence. *Id.* at 392–33. The relevant criteria in determining whether the prejudice of an extraneous offense outweighs its probative value include:

(1) how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2) the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3) the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense;

(4) the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to

him to help establish this fact, and is this fact related to an issue in dispute. *See also Montgomery,* 810 S.W.2d at 389–90; *Santellan v. State,* 939 S.W.2d 155, 169 (Tex.Crim.App.1997).

As pointed out in the summary of defendant's evidence on the issue of guilt or innocence, Dr. Conroy, testifying for the appellant, was of the opinion that the repetitious theme of the testimony of both Debbi and C.W. indicated that Debbi was, in fact, the source of both her testimony and the child's testimony. Dr. Conroy further testified that appellant was not in any way aggressive and simply trying to make his wife happy, following in effect, her directions and that the appellant was the victim in this situation.

The trial court, at the conclusion of the second hearing outside the presence of the jury, during which he heard the testimony of Lori Harrell concerning the extraneous offenses and conducting the balancing test, required under Rule 403 TEX.R. EVID., determined that the probative value of Lori Harrell's evidence was not substantially outweighed by the danger of unfair prejudice. The court stated that there was "definitely a material issue being contested as to the peaceability or the peaceful nature of the defendant. And I think that the jury at this point is not in a position to do a fair evaluation by the picture that had been painted by the defense's expert."

The evidence given by Lori Harrell was compelling given Dr. Conroy's testimony concerning C.W. being programmed by Debbi. Lori Harrell's testimony concerning similar events involving her children and appellant's conduct toward her tended to substantiate the testimony of Debbi Thomas and C. W.

The potential of impressing the jury into deciding irrationally, as argued by the appellant, was not present.

We find that the evidence of Lori Harrell was admissible under rule 404(b) of the Texas Rules of Evidence, *Montgomery* and *Santellan.* We further find that the

trial court did not abuse its discretion in admitting such evidence and that it comported with Rule 403 of the Texas Rules of Evidence, by conducting a proper balancing test.

Appellant's point one is overruled.

## *POINT II*

The trial court committed reversible error by permitting the complainant, C.W., to testify that defendant had sexually assaulted her on five separate occasions prior to the two for which he was being tried.

■ Appellant complains of the admission into evidence through the testimony of C.W. of five separate uncharged extraneous sexual assaults on C.W. and that notwithstanding state statute, five uncharged extraneous offenses shed no probative light on (a) the state of mind of the defendant or the child; or (b) the previous relationship between the defendant and the child. *See generally* TEX.CODE CRIM. PROC. ANN. art. 38.37 (Vernon 1998).

He argues that admissibility of such evidence is barred by Rule 404(b) because it constitutes evidence of defendant's bad character solely to show that he was acting in conformity therewith when he committed the charged offenses and that the probative value, if any, of the five uncharged extraneous offenses is substantially outweighed by danger of unfair prejudice and inadmissible under TEX.R. EVID. 403.

The appellant filed a pretrial motion alleging in effect the above as grounds for not allowing such testimony. At the commencement of the trial and out of the presence of the jury, a hearing was held on his motion to exclude the five uncharged extraneous sexual assaults. At the conclusion of the hearing, the court ruled that the extraneous offenses would be admitted to show the state of mind of the appellant and the child with the proper limiting instructions.

Under article 38.37 of the Texas Code Criminal Procedure, appellant argues that in the five uncharged extraneous assaults the State's evidence shows that they were conducted in secret for sexual gratification, contrary to the two charged assaults where the child was brought into the picture not for appellant's sexual gratification, but to use as a "tool" in order to dissuade Debbi Thomas from leaving him.

Appellant contends that weighing of the probative value against the prejudicial effect establishes that the probative value of the five extraneous acts is not compelling in that the strength of the State's case is based upon the consistency between the mother's story of what happened and C.W.'s story of what happened. Proof of the claimed extraneous acts committed by the defendant upon the daughter alone at earlier times is of very little relevance, if any, to the assertions made by both mother and daughter of what defendant is claimed to have done to both of them in the presence of each other on the date of the alleged charged offense.

Appellant also contends that there is the chance of prejudice that the five uncharged assaults will tend to inflame the jury against the defendant and that the jury would be acting unfairly and irrationally. Appellant argues that application of the balancing test required by Rule 403 mandates that the claimed extraneous acts be excluded.

The State's argument is that the nature of the relationship between the child and the appellant is explained by the extraneous conduct in that it makes more reasonable the fact that the child, on the date alleged in the indictment, did what appellant told her to do and did not resist; thus, helping to explain the victim's compliance.

The State points out that following the rulings in *Vernon v. State,* 841 S.W.2d 407 (Tex.Crim.App.1992) and *Pavlacka v. State,* 892 S.W.2d 897 (Tex.Crim.App. 1994), the legislature in 1995 reacted by enacting a new provision to allow the admissibility of uncharged misconduct in child abuse cases. *See generally* TEX.CODE CRIM. PROC. ANN. art. 38.37 (Vernon 1998).

We agree with the State that the court did conduct its balancing test properly under rule 403 of the Texas Rules of Evidence and that the testimony by C.W. concerning the prior sexual encounters with appellant was admissible under article 38.37 of the Texas Code of Criminal Procedure and the guidelines as set forth in *Montgomery. Cf. Howland v. State,* 990 S.W.2d 274 (Tex.Crim.App.1999). The evidence concerning the prior sexual acts between C.W. and appellant was admissible. Appellant's point two is overruled.

### *POINT III*

Appellant was denied his fundamental right to a fair trial guaranteed by the due process clause of the Fourteenth Amendment to the U.S. CONSTITUTION and § 19 of article I of the TEXAS CONSTITUTION by admission of evidence of numerous extraneous bad acts, including nineteen which constituted criminal offenses, during the innocence or guilt phase of the trial.

■ Appellant cites *Hobbs v. Lockhart,* 791 F.2d 125 (8th Cir.1986), a federal habeas corpus proceeding challenging a state conviction, alleging that fundamental fairness of the entire trial was tainted by the cumulative effect of admitting other evidence of crimes. Specifically, Hobbs challenged the admission of testimony concerning his attempted escape from the White County Jail several months after the charged crime, his purchase of whiskey a few hours after the crime, his purchase of marijuana in Little Rock, Arkansas the day after the crime, his procuring the services of a prostitute the day after the crime, and his living with Mrs. Kathy Davis, a white woman. Hobbs asserted that this evidence was so egregious, so remote in time and circumstance, and so prejudicial, that its admission denied him due process of law.

The Eighth Court of Appeals in denying Hobbs relief, stated:

We can only conclude that the admission of the challenged testimony was not "so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived Hobbs of fundamental fairness."

*Id.* at 128. We find that *Hobbs* does not support the defendant's contention.

The case *United States v. Michelson,* 165 F.2d 732 (2d Cir.1948), *aff'd,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), involved a conviction dealing with bribery of a federal revenue agent. There, the Circuit Court of Appeals affirmed the lower court's decision. The United States Supreme Court also affirmed the judgment. Appellant cites *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), to support his argument.

*Michelson* put on reputation and character evidence. The issue was whether or not the prosecution had the right to cross examine those character witnesses on whether or not they had heard that on October 11, 1920, the defendant, Solomon Michelson, was arrested for receiving stolen goods. The Supreme Court went into a lengthy discussion on the utilization of "whether or not questions" and discussed the overriding policy of excluding such, despite its admitted probative value. *Michelson* is of limited value because it has been superseded by the FEDERAL RULES OF EVIDENCE.

Appellant also cites *United States v. San Martin,* 505 F.2d 918 (5th Cir.1974). In this case, the appellant was charged and found guilty of assaulting an FBI agent while the agent was in the performance of his duties. The Fifth Circuit held that the evidence of appellant's three prior convictions was not sufficient because the facts of the charges were not introduced in evidence, therefore, the evidence was not plain, clear, and convincing.

The State points out that Rule 414 of the Federal Rules of Evidence, effective July 9, 1995, includes a provision similar to, but broader than, article 38.37 of the Texas Code of Criminal Procedure, which would have made the five extraneous offenses against C.W. admissible under the federal rules. Rule 414 of the Federal Rules of Evidence, like Rule 404 of the Texas Rules of Criminal Evidence, allows the introduction of other crimes, wrongs, or acts so long as the balancing test is conducted. Both statutes favor admissibility. *See United States v. Day,* 591 F.2d 861, 879 (D.C.Cir.1978); *see also United States v. Beechum,* 582 F.2d 898, 911–15 (5th Cir. 1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

Concerning article I, section 19 of the Texas Constitution, appellant cites *Reese v. State,* 877 S.W.2d 328 (Tex.Crim.App. 1994). There, the Court of Criminal Appeals held that the use of contingent fee paid informant did not violate due process and the due course of law provisions of the federal and state constitutions. The Court reversed the case on other grounds. The case stands for the proposition that due process in both state and federal constitutions means that the accused shall in criminal cases be accorded that fundamental fairness necessary to do as administration of justice.

Appellant fails to cite any authority establishing that TEX.CODE CRIM. PROC. art. 38.37 or TEX.R. EVID. 404(b) and 403 are unconstitutional either on their face or in their application to the facts of this case.

We find that appellant was not denied his fundamental rights as guaranteed to him by amendment XIV, section 1 of the United States Constitution or article I, section 19 of the Texas Constitution. Appellant's point three is overruled.

Finding no reversible error, the judgment of the trial court is affirmed.